# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |
|---|---|
| SOLVAY PHARMACEUTICALS, INC.,      ) | |
| ) | |
| Plaintiff-Claimant,      ) | |
| ) | Case No. 1:04 CV 414 |
| v.      ) | |
| ) | The Hon. Herman J. Weber |
| DURAMED PHARMACEUTICALS, INC.,      ) | |
| ) | |
| Defendant-Respondent.      ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD AND IN OPPOSITION TO APPLICATION TO CONFIRM ARBITRATION AWARD

s / James E. Burke

James E. Burke (#0032731)
R. Patrick DeWine (#0064516)
KEATING, MUETHING & KLEKAMP, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, OH 45202
Tel: 513-579-6400
Fax: 513-579-6457

Thomas D. Yannucci, P.C.
Christopher Landau
Pat A. Cipollone
Gerald F. Masoudi
KIRKLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
Tel: 202-879-5000

*Attorneys for Duramed Pharmaceuticals, Inc.*

August 9, 2004

# **TABLE OF CONTENTS**

Introduction ........................................................................................................................ 1

Background ........................................................................................................................ 3

    A.    The 1999 Cenestin Agreement. ................................................................ 3

    B.    The Amendment. ..................................................................................... 5

    C.    The Termination And Arbitration ............................................................ 6

Standard Of Review ........................................................................................................ 10

Argument ......................................................................................................................... 11

This Court Should Vacate The Arbitration Award Because the Arbitration Panel
       Exceeded Its Authority ......................................................................................... 11

    A.    The Panel Exceeded Its Authority By Awarding A Remedy Clearly
          Forbidden By The Parties' Agreement. ................................................... 12

    B.    The Panel Exceeded Its Authority By Awarding $68 Million in
          Damages For Termination When The Agreement Expressly
          Permitted Termination. ........................................................................... 15

    C.    Solvay's Attempts To Avoid The Agreement's "Exclusive
          Remedy"/"No Damages" Provision And Termination Provisions
          Must Be Rejected .................................................................................... 16

    D.    The Panel Exceeded Its Authority By Purporting To Award Post-
          Judgment Interest Beyond What Is Permitted Under Federal Law. .......... 19

Conclusion ...................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Appalachian Reg'l Healthcare, Inc. v. United Steelworkers of Am.*,
    245 F.3d 601 (6th Cir. 2001) ............................................................................11

*AT&T Techs., Inc. v. Communications Workers of Am.*,
    475 U.S. 643 (1986) ........................................................................................11

*Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local No. 7*,
    114 F.3d 596 (6th Cir. 1997) ....................................................................10, 12

*Bradley v. United States*,
    No. 189-76, 1977 WL 9579 (Ct. Cl. Apr. 1, 1977) ..........................................16

*Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*,
    888 F.2d 260 (2d Cir. 1989) .............................................................................19

*Century 21 Am. Landmark, Inc. v. McIntyre*,
    427 N.E.2d 534 (Ohio App. 1980) ...................................................................17

*Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*,
    537 N.E.2d 624 (Ohio 1989) ............................................................................13

*Cincinnati, Sandusky & Cleveland RR. Co. v. Indiana, Bloomington & W. Ry. Co.*,
    7 N.E. 139 (Ohio 1886) ...................................................................................18

*Coast Trading Co. v. Pacific Molasses Co.*,
    681 F.2d 1195 (9th Cir. 1982) .........................................................................13

*Condon v. H.C. Hazen Contracting Co.*,
    170 N.E. 870 (Ohio 1930) ...............................................................................18

*Dawahare v. Spencer*,
    210 F.3d 666 (6th Cir. 2000) ...........................................................................18

*dB Sales, Inc. v. Digital Equip. Corp.*,
    951 F. Supp. 1322 (N.D. Ohio 1996),
    *aff'd*, 125 F.3d 855 (6th Cir. 1997)
    *accord Gollberg v. Bramson Publ'g Co.*,
    685 F.2d 224 (7th Cir. 1982) ...........................................................................16

*Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*,
    889 F.2d 599 (5th Cir. 1989) ...........................................................................12

*Eisenmann Corp. v. Sheet Metal Workers Int'l Ass'n Local No. 24*,
    323 F.3d 375 (6th Cir. 2003) ...........................................................................10

*Federated Dep't Stores v. J.V.B. Indus., Inc.,*
    894 F.2d 862 (6th Cir. 1990) ...................................................................18

*Ficks Reed Co. v. Local Union 112 of the Int'l Union,*
    965 F.2d 123 (6th Cir. 1992) ............................................................11, 13

*First Options of Chicago, Inc. v. Kaplan,*
    514 U.S. 938 (1995) ............................................................................11

*Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.,*
    678 N.E.2d 519 (Ohio 1997) ...............................................................18

*Glennon v. Dean Witter Reynolds, Inc.,*
    83 F.3d 132 (6th Cir. 1996) .................................................................10

*Green v. Ameritech Corp.,*
    200 F.3d 967 (6th Cir. 2000) ...............................................................10

*Grinnell Corp. v. Local Union 854, United Ass'n of Journeymen,*
    882 F. Supp. 684 (W.D. Tenn. 1993) ...................................................19

*Imbrogno v. MIMRx.COM, Inc.,*
    No. 03AP-345, 2003 WL 22707792 (Ohio App. Nov. 18, 2003) ...............17

*Int'l Union of Elec., v. Hurd Corp.,*
    Nos. 00-5016 & 00-5119, 2001 WL 210578 (6th Cir. Feb. 20, 2001) .............11

*Johnson Lakes Dev., Inc. v. Central Neb. Pub. Power & Irrigation Dist.,*
    576 N.W.2d 806 (Neb. 1998) ...............................................................16

*Katz v. Feinberg,*
    290 F.3d 95 (2d Cir. 2002) ..................................................................10

*Klaiss v. Klaiss,*
    No. 13-87-6, 1988 WL 40422 (Ohio App. May 2, 1988)............................17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros,*
    70 F.3d 418 (6th Cir. 1995) .................................................................18

*MidMichigan Reg'l Med. Ctr.-Clare v. Prof'l Employees Div. of Local 79,*
    183 F.3d 497 (6th Cir. 1999) ...............................................................10

*Miller v. Wikel Mfg. Co.*
    545 N.E.2d 76 (Ohio 1989) .................................................................17

*Missouri River Servs., Inc. v. Omaha Tribe of Nebraska,*
    267 F.3d 848 (8th Cir. 2001) ...............................................................13

*Nationwide Mut. Ins. Co. v. Home Ins. Co.*,
  330 F.3d 843 (6th Cir. 2003) ............................................................10

*NCR Corp. v. Sac-Co., Inc.*,
  43 F.3d 1076 (6th Cir. 1995) ...........................................................12

*Norman v. Recreation Ctrs. of Sun City, Inc.*,
  752 P.2d 514 (Ariz. Ct. App. 1988) .................................................16

*Oil, Chem. & Atomic Workers Int'l Union v. Martin Marietta Energy Sys., Inc.*,
  646 N.E.2d 883 (Ohio App. 1994) ...................................................17

*Oneida Sand and Gravel, Inc. v. Messer*,
  No. 601, 1992 WL 236872 (Ohio App. Sept. 25, 1992) ...................17

*Ottery v. Bland*,
  536 N.E.2d 651 (Ohio App. 1987) ...................................................18

*Parsons & Whittemore Ala. Mach. & Serv. Corp. v. Yeargin Constr. Co.*,
  744 F.2d 1482 (11th Cir. 1984) .......................................................19

*Riordan's Sporting Goods, Inc. v. Riordan's Sports & Equip., LLC*,
  No. 2002-T-0099, 2003 WL 21689860 (Ohio App. July 18, 2003) ...17

*Roadway Package Sys., Inc. v. Kayser*,
  257 F.3d 287 (3d Cir. 2001) ............................................................10

*Rulli v. Fan Co.*,
  683 N.E.2d 337 (Ohio 1997) ...........................................................17

*Scovill v. WSYX/ABC, Sinclair Broad. Group, Inc.*,
  312 F. Supp. 2d 955 (S.D. Ohio 2004) ............................................17

*Singpiel v. Morris*,
  582 N.W.2d 715 (S.D. 1998) ...........................................................16

*Starr Co. v. CBS*,
  36 N.E.2d 861 (Ohio App. 1941) .....................................................18

*Swift Indus., Inc. v. Botany Indus., Inc.*,
  466 F.2d 1125 (3d Cir. 1972) ..........................................................14

*Trinova Corp. v. Pilkington Bros., P.L.C.*,
  638 N.E.2d 572 (Ohio 1994) ...........................................................18

*Turner v. Langenbrunner*,
  No. 2003-10-099, 2004 WL 1197213 (Ohio App. June 1, 2004) ......17

*Wiepking v. Prudential-Bache Sec., Inc.,*
    940 F.2d 996 (6th Cir. 1991) ......................................................................11, 12

**Federal Statutes**

28 U.S.C. § 1961(a) .........................................................................................19

9 U.S.C. § 10 ...................................................................................................10

9 U.S.C. § 10(a)(4) .....................................................................................12, 13

9 U.S.C. § 9 .....................................................................................................10

**Other Authorities**

1 Martin Domke,
    *The Law & Practice of Commercial Arbitration* (2003) ...................................20

## INTRODUCTION

Arbitration is a matter of contract, and an arbitrator's power begins and ends with the terms of the contract that provides for arbitration in the first place. In this case, the same contract that conferred authority upon the arbitrators also limited that authority. The Federal Arbitration Act (the "FAA") expressly requires courts to vacate arbitration awards "where arbitrators exceeded their powers." Courts are to conduct *de novo* review of these matters.

The arbitration provision here is part of a written agreement between two sophisticated businesses – Solvay Pharmaceuticals, Inc. and Duramed Pharmaceuticals, Inc. – to co-promote Cenestin, a new prescription drug that Duramed developed. The parties entered into a detailed Cenestin Co-Promotion Agreement in October 1999 ("Agreement" or "1999 Cenestin Agreement"), and amended it in a letter dated January 27, 2000. In the 1999 Cenestin Agreement, the parties agreed to arbitrate disputes arising under the Agreement, but also expressly limited available remedies. In particular, the parties agreed that the "exclusive remedy" for any breach of the Agreement was "[t]ermination," and that "except as expressly provided herein, *neither party shall have any liability for damages to or lost profits of the other, direct or consequential.*" And the only possible remedy for termination "expressly provided" in the 1999 Cenestin Agreement was a contractual residual payment, available to Solvay under certain conditions, that in this case amounted to approximately $10 million.

Notwithstanding these limits, the panel awarded $68 million in damages.[1] Solvay attempts to avoid the express limits on the arbitrators' authority by arguing that it is not seeking

---

[1] This $68 million was over and above the $47 million already paid to Solvay by Duramed while the agreement was in force and the nearly $30 million made by Solvay on a stock investment in Duramed that was part of the parties' relationship.

relief under the 1999 Cenestin Agreement as amended, but instead is relying on a supposedly separate and independent contract, which consists only of paragraphs 2 and 3 of the January 27, 2000 Letter. Solvay gerrymanders the paragraphs from the letter into three separate contracts, and Solvay contends that the two-paragraph agreement on which it relies is not subject to the "exclusive remedy"/"no damages" clause and other provisions in the 1999 Cenestin Agreement.

But that argument proves too much. If Solvay's proposed two-paragraph contract is not subject to the "exclusive remedy"/"no damages" clause and other provisions of the fully integrated 1999 Cenestin Agreement, then it is equally not subject to the arbitration provision contained in that same contract. Either way, the arbitration panel here had no power to award $68 million in damages as a remedy in this dispute. That makes sense: the parties did not agree to waive their substantive and procedural litigation rights with respect to disputes that could result in potentially limitless damages awards.

Arbitration, in other words, is not a matter of "in for a penny, in for a pound": parties can, and routinely do, agree to limit the remedies available in arbitration precisely because they agree to limit their substantive and procedural rights in arbitration. One right parties do not give up, however, is the right to ask a court to enforce the contractual limits on the arbitrators' authority. Indeed, Duramed asked the panel for summary judgment on the basis that the panel could not award damages under the amended 1999 Cenestin Agreement, which contained an express bar on damages, and in any event that the panel would not have the authority to arbitrate a dispute arising from Solvay's supposed two-paragraph contract, which has no arbitration clause.

Solvay now asks that this Court confirm the arbitration award in its entirety. But this would require the Court to (i) accept Solvay's "two-paragraph contract" theory, which is directly

2

contrary to the contract language, basic Ohio law and common sense; (ii) reject the legal conclusion that the January 27, 2000 Letter "amended" the 1999 Cenestin Agreement (as the panel majority stated); (iii) violate the parties' express "exclusive remedy"/"no damages" provision; (iv) ignore the Agreement's express termination provisions; (v) overlook the specific formula for calculation of the residual payment (the only possible contractually legitimate recovery in this case), which would have yielded an award of approximately $10 million; and (vi) accept an award of $68 million on a contract that Solvay itself had projected (and the panel Chairman concluded) would likely lose money for Solvay had it continued in force. Under the *de novo* standard that governs this Court's review of whether the arbitrators exceeded their authority, the Court should deny Solvay's motion to confirm the arbitration award and grant Duramed's motion to vacate the arbitration award.

## BACKGROUND

### A.    The 1999 Cenestin Agreement.

On October 6, 1999, Solvay and Duramed entered the 1999 Cenestin Agreement.  (1999 Cenestin Agreement (attached at Tab A)).  Solvay agreed to promote Cenestin with its sales force, while Duramed signed a related contract to promote two of Solvay's products with Duramed's sales force.  (*Id.* § 3.1.1; Estratest and Prometrium Co-Promotion Agreement ("Prometrium Agreement") (attached at Tab B)).  The 1999 Cenestin Agreement expressly provided that "[t]ermination by one party shall be the *exclusive remedy* for a default by the other party under this AGREEMENT and, except as expressly provided herein, *neither party shall have any liability for damages to or lost profits of the other, direct or consequential.*"  (1999 Cenestin Agreement § 13.10 (emphasis added)).

Like many contracts, the 1999 Cenestin Agreement contains both a term provision and termination provisions. Section 13.1 of the Agreement stated that the "TERM OF THE AGREEMENT" would expire "unless the parties mutually agree, in writing, to extend or shorten the TERM OF THE AGREEMENT." The 1999 Cenestin Agreement was set to expire by its terms on December 31, 2000, "unless extended" by the parties. (*Id.* § 1.13). Section 13.1 further stated that "[t]he Agreement may be terminated earlier than the expiration of the TERM OF THE AGREEMENT as provided in Article 13." The Agreement contained a number of different termination provisions, including:

- a provision whereby Solvay could terminate at any time by giving Duramed six months' notice, based on a good faith reasonable determination that Cenestin did not justify continued co-promotion (*Id.* § 13.2);

- a provision whereby either party could terminate the agreement at any time by giving the other 30 days' notice, based on a breach by the other party that was not corrected within that period (*Id.* § 13.3);

- a provision whereby either party could terminate the Agreement after June 30, 2000, upon three months' notice if the parties had not by then "concluded and executed" a "long term agreement to replace this AGREEMENT which is anticipated to cover the co-promotion, research and development, and manufacture of existing and future women's health products," provided that Duramed would then pay Solvay a "residual payment" based on Duramed's gross margin in the quarter in which termination took effect (*Id.* § 13.4); and

- a provision whereby "[a]ny termination of any of the RELATED AGREEMENTS shall also serve as a termination of this Agreement," without any residual payment. (*Id.* § 13.8).

The parties specified that the 1999 Cenestin Agreement was to be construed under Ohio substantive law (*id.* § 18.1), and that "[a]ny dispute, controversy or claim arising out of or relating to this AGREEMENT" would be resolved by arbitration, if the parties could not work out their differences. (*Id.* § 22.1). Finally, the 1999 Cenestin Agreement included a broad integration clause, providing that the Agreement "contains the entire agreement between the

parties in respect of the subject matter hereof," and could not be "changed or modified in any manner ... unless in writing and signed by the duly authorized officers or representatives of the parties." (*Id.* § 20.1).

## B.   The Amendment.

On January 27, 2000, the parties executed a letter of amendment confirming their agreement to certain additional terms. (*See* Letter (attached at Tab C)). In particular, the letter set forth an "extended and enhanced alliance with respect to the co-promotion of Cenestin®," which included (1) an extension of the "term" of "the Cenestin co-promotion agreement"; (2) a commitment by Solvay to fund some additional expenses (beyond the cost of its own sales force) incurred in the promotion of Cenestin; and (3) a profit-sharing mechanism (whereas Duramed previously had received all profits). (*See id).* The letter expressly stated that it involved an "extended and enhanced alliance with respect to the co-promotion of Cenestin" and extended the term of "the Cenestin co-promotion agreement." (*See id.* at SOLVAY 005737). Solvay itself drafted both the Agreement and the Letter Amendment. (Hr'g Tr. at 2549; 2992; 04315; 04328).[2]

Before this litigation, Solvay never contended that the operative contract between the parties consisted only of paragraphs 2 and 3 of the January 27, 2000 Letter. To the contrary, Solvay consistently identified the January 27, 2000 Letter as an amendment to the 1999 Cenestin Agreement. For example, on April 5, 2001, Solvay's CEO Harold Shlevin wrote to Duramed and explicitly stated that the Cenestin "co-promotion agreement was entered on October 6, 1999 and further amended and extended on 1-27-2000." (Shlevin Letter (attached at Tab D)).

---

[2] Excerpts from the Hearing Transcript are attached at Tab G.

Likewise, even after receiving notice of Duramed's termination of the 1999 Cenestin Co-Promotion Agreement, an internal management document circulated within Solvay (including to Solvay's General Counsel), described the January 27, 2000 Letter as the "Amended Co-Promotion Agreement." (Duramed Ex. 94 (attached at Tab E)). And, of course, the panel itself determined that the relevant agreement in this case was the 1999 Cenestin Agreement "dated October 6, 1999, as amended by the letter agreement entered into by the parties on January 27, 2000." (Arbitration Award at 1 (attached at Tab F)).

The letter itself does not purport to be a separate and independent agreement between the parties, much less to contain three separate and independent contracts. To the contrary, the letter is necessarily premised on the ongoing vitality of the 1999 Cenestin Agreement. Nothing in the letter purports to alter or abrogate either the termination provisions or the "exclusive remedy"/"no damages" provision of the Agreement, and the letter does not contain its own arbitration clause.

## C.     The Termination And Arbitration.

In late 2001 and early 2002, Duramed and Solvay engaged in lengthy discussions and traded numerous proposals in an effort to reach a broad hormone alliance as contemplated in section 13.4 of the 1999 Cenestin Agreement, but were unable to reach an agreement on this broader alliance. On March 29, 2002, Duramed gave Solvay written notice that it intended to terminate the Agreement (as well as the related agreement involving Prometrium) effective June 30, 2002. (*See* Duramed Ex. 818 (attached at Tab H)). Solvay accepted termination of the Prometrium Agreement. Solvay thereafter filed an arbitration demand under Section 22.1 of the 1999 Cenestin Agreement. (*See* Arbitration Demand (attached at Tab I)).

Although Solvay requested arbitration under the Agreement, Solvay refused to accept the "exclusive remedy" authorized by the Agreement: "[t]ermination." (1999 Cenestin Agreement § 13.10). Rather, notwithstanding the express contractual prohibition on damages, "direct or consequential," Solvay sought damages based on Duramed's alleged wrongful termination. Solvay ultimately developed the theory that the January 27, 2000 Letter was not an "amendment" of the Agreement at all, but instead three *separate and independent* contracts, one of which consisted of paragraphs 2 and 3 of the letter and was free from the Agreement's "exclusive remedy"/"no damages" and termination provisions. Duramed challenged that interpretation during the arbitration and even filed for summary judgment well before the hearing, explaining that Solvay's theory "would mean that this arbitration could never have been brought, because [the letter] do[es] not contain an arbitration provision." (Respondent Duramed Pharmaceuticals, Inc.'s Mot. for Summ. J. at 1 (attached at Tab J); *see also* Respondent Duramed Pharmaceuticals, Inc.'s Opp'n to Claimant Solvay Pharmaceutical, Inc.'s Mot. for Partial Summ. J. at 1 (attached at Tab K) (same)).

Like the plain language of the contractual documents, the evidence at the hearing contradicted Solvay's contention that two paragraphs of the January 27, 2000 Letter are a separate contract that could not be terminated and that was not subject to the "exclusive remedy"/"no damages" provision.

*First*, nobody at Solvay – not the business people, not the analysts, and not even the lawyers – ever expressed the view in any document that the January 27, 2000 Letter constituted three separate contracts until after Solvay filed the arbitration demand. (Hr'g Tr. at 00667; 2616-17; 03384). Solvay's own witnesses testified consistent with what the arbitration panel found:

that the January 27, 2000 Letter was an "amendment" to the 1999 Cenestin Agreement. (Hr'g Tr. at 0812; 04111-04112; 04341).

*Second*, Solvay knew that the amended 1999 Cenestin Agreement could be terminated. In a Solvay "Women's Health Franchise Strategic Assessment" dated April 27, 2001, Solvay concluded that "[t]he relationship with Duramed is currently not profitable and will remain unprofitable unless the brand Cenestin can achieve significant sales to recover all expenses. The timeline for this expectation may lie outside the current agreement and thus will result in a negative outcome for the franchise." The internal strategic assessment concluded that a "decision must be made" whether Solvay itself should *terminate the relationship*." (Duramed Ex. 322 at SOLVAY 072975 (attached at Tab L) (emphasis added)). Indeed, Solvay's highest-level executives considered whether Solvay should simply "step out of the deal." (Duramed Ex. 122 (attached at Tab M) at SOLVAY 068234).

*Finally*, Solvay recognized that the no-damages provision precluded any demand for payment other than (at most) the residual payment. As Solvay's most senior pharmaceuticals executive testified, Solvay "agreed that in the event of the termination of the Cenestin co-promotion relationship, Solvay wouldn't seek lost profits from Duramed." (Hr'g Tr. at 04329). And Solvay's own internal analysis in 2002 of what would happen if "Barr terminates" the Agreement showed no payments to Solvay after termination other than the contractual residual payment. (Duramed Ex. 267 (attached at Tab N)).

Notwithstanding this evidence and clear contractual prohibition on damages, a divided arbitration panel awarded Solvay $68 million in damages. Although Duramed's potential liability under the contract was capped at the amount of a "residual payment" that, by definition, could never exceed one quarter's gross margin of the product being sold (here, about $10

8

million) (*see* 1999 Cenestin Agreement §§ 4.3, 13.4),[3] the arbitration award exceeds the entire gross margin for the life of the Agreement before termination. And this arbitration award is over and above the $47 million that Solvay collected under the 1999 Cenestin Agreement before termination (*see* Duramed Ex. 140 (attached at Tab O)) and above Solvay's almost $30 million in gains on a purchase of Duramed stock under an option granted as part of the parties' relationship. (Hr'g Tr. at 3748).

The panel majority stated that the panel had been "designated in accordance with the arbitration agreement entered into between the ... parties and dated October 6, 1999, *as amended by* the letter agreement entered into by the parties on January 27, 2000." (Arbitration Award at 1 (emphasis added)). The panel Chairman, Arbitrator Mercurio, filed a separate dissenting statement stating that "the $68 million damage award ... far exceeds any damages the evidence would support." (Arbitration Award, Statement of Chairman Mercurio at 2). In particular, Chairman Mercurio noted that Solvay never would have made anything close to $68 million had the Agreement remained in force. (*See id.* at 3 n. 3 ("At the level of sales costs forecast in April 2002, . . . Solvay would never have recovered its cumulative advertising sales and promotion expenses.")). In other words, Solvay would have lost money. This was consistent with various internal Solvay analyses, in which Solvay considered terminating the relationship because the agreement was "not profitable," and may result in a "negative outcome" for Solvay. (Duramed Ex. 322 at SOLVAY 072975).

---

[3] The residual payment defined in Section 4.3 of the Agreement consists of 20 quarterly payments, each of which equals one twentieth of the gross margin "for the quarter of the calendar year in which the AGREEMENT expires or in which termination becomes effective." Solvay's own analysis showed the gross revenues for that quarter – and hence the sum of the 20 quarterly payments – to be $10,127,608. (Duramed Ex. 140 at SOLVAY 077587).

One day after the panel issued its arbitration award, Solvay filed a motion to confirm that award in this Court pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. This response and a corresponding motion to vacate the award under Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10, now follow.

## STANDARD OF REVIEW

Under the Federal Arbitration Act, arbitration awards must be vacated whenever "the arbitrators exceeded their powers …"[4] 9 U.S.C. § 10. The Sixth Circuit has made it clear that courts need not accord deference to an arbitration panel on the scope of the panel's authority, which is reviewed *de novo*. *MidMichigan Reg'l Med. Ctr.-Clare v. Prof'l Employees Div. of Local 79*, 183 F.3d 497, 501 (6th Cir. 1999); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 847-48 (6th Cir. 2003); *Green v. Ameritech Corp.*, 200 F.3d 967, 974 (6th Cir. 2000)). Despite the deference generally accorded to arbitration awards, the court's "review is not toothless when an arbitrator's award disregards the . . . agreement and its terms." *Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997). If the arbitrator "departs from 'even arguably construing the contract,' [the] court must vacate the award."[5] *Id.* at 600.

---

[4]    The Sixth Circuit also has held that a court should vacate arbitration awards made "in manifest disregard of the law," *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996), and awards that are "contrary to a well-defined and dominant public policy," *Eisenmann Corp. v. Sheet Metal Workers Int'l Ass'n Local No. 24*, 323 F.3d 375, 380 (6th Cir. 2003). An arbitration panel acts in manifest disregard of the law when its decision "fl[ies] in the face of clearly established legal precedent." *Glennon*, 83 F.3d at 136 (internal quotations omitted).

[5]    *See, e.g.*, *Katz v. Feinberg*, 290 F.3d 95 (2d Cir. 2002) (affirming partial vacatur of arbitration award because arbitration panel exceeded its authority in issuing valuation of share purchase price when agreement assigned that determination to independent accountant); *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287 (3d Cir. 2001) (affirming vacatur because

## ARGUMENT

### THIS COURT SHOULD VACATE THE ARBITRATION AWARD BECAUSE THE ARBITRATION PANEL EXCEEDED ITS AUTHORITY

This Court should vacate the arbitration award for the simple reason that the panel majority manifestly exceeded its contractual authority by awarding $68 million in damages under a contract that expressly barred any award of damages, "direct or consequential," and by finding wrongful termination when the Agreement expressly allowed Duramed to terminate. If there is any principle in the field of arbitration that is well-established, it is that arbitration is a matter of contract, and hence arbitrators are bound by contractual limitations on their authority. *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve th[e] disputes – but only those disputes – that the parties have agreed to submit to arbitration."); *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648-49 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.").

---

arbitrator disregarded contractual termination provisions and instead decided propriety of termination based on considerations of fairness regarding notification procedures); *Appalachian Reg'l Healthcare, Inc. v. United Steelworkers of Am.*, 245 F.3d 601 (6th Cir. 2001) (affirming vacatur because award conflicted with express terms of the parties' agreement regarding the employer's power to compel part-time employees to work overtime); *Int'l Union of Elec., v. Hurd Corp.*, Nos. 00-5016 & 00-5119, 2001 WL 210578 (6th Cir. Feb. 20, 2001) (vacating arbitration award that conflicted with the express terms of the parties' agreement regarding employees' eligibility to accrue vacation time); *Ficks Reed Co. v. Local Union 112 of the Int'l Union*, 965 F.2d 123 (6th Cir. 1992) (affirming vacatur because award required employer to rehire striking workers immediately despite express contract provision stating that employer could defer rehiring until workers were needed); *Wiepking v. Prudential-Bache Sec., Inc.*, 940 F.2d 996 (6th Cir. 1991) (vacating arbitration award adjudicating federal securities law claims because parties' agreement exempted such claims from arbitration).

Indeed, the need to confine arbitrators within their contractual bounds is one of the key justifications for judicial review of arbitral awards: because arbitrators have discretion *within* the bounds of their contractual authority, it is critical for courts to ensure that arbitrators have not *exceeded* the bounds of that authority. *See, e.g., Beacon*, 114 F.3d at 599; *Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 602 (5th Cir. 1989) ("[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end."). Dutifully enforcing those bounds promotes, not inhibits, arbitration, because parties would never agree to arbitrate their disputes if they had no reassurance that arbitrators would respect any limits. That is why the Federal Arbitration Act authorizes courts to vacate arbitration awards where "the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(4), and why courts have not hesitated to do so, *see, e.g., Nationwide*, 330 F.3d at 847-48; *NCR Corp. v. Sac-Co., Inc.*, 43 F.3d 1076, 1080-81 (6th Cir. 1995); *Wiepking*, 940 F.2d at 998-99.[6]

## A.     The Panel Exceeded Its Authority By Awarding A Remedy Clearly Forbidden By The Parties' Agreement.

Duramed and Solvay agreed to arbitrate in the context of an agreement that precluded large and unpredictable awards like the one under review. The amended 1999 Cenestin Agreement expressly provides that "[t]ermination" is the "exclusive remedy" for any breach of

---

[6] This bedrock principle has arisen with some frequency. *See, e.g., Appalachian Reg'l Healthcare*, 245 F.3d at 604-07; *Wyandot, Inc. v. Local 227, United Food & Commercial Workers Union*, 205 F.3d 922, 929-30 (6th Cir. 2000); *Beacon*, 114 F.3d at 600-01; *Ficks Reed*, 965 F.2d at 125-26; *Int'l Ass'n of Machinists & Aerospace Workers v. Lourdes Hosp., Inc.*, 958 F.2d 154, 157 (6th Cir. 1992); *Int'l Bhd. of Elec. Workers Local 429 v. Toshiba Am., Inc.*, 879 F.2d 208, 210-11 (6th Cir. 1989); *Dobbs, Inc. v. Local No. 614, Int'l Bhd. Of Teamsters*, 813 F.2d 85, 86-88 (6th Cir. 1987); *Cement Divs., Nat'l Gypsum Co. v. United Steelworkers of Am.*, 793 F.2d 759, 766-67 (6th Cir. 1986); *Ford Motor Co. v. Plant Protection Ass'n Nat'l*, 770 F.2d 69, 75-76 (6th Cir. 1985); *Sears, Roebuck & Co. v. Teamsters Local No. Union 243*, 683 F.2d 154, 155-56 (6th Cir. 1982).

the contract, and further specifies that "except as expressly provided herein, neither party shall have any liability for damages to or lost profits of the other, direct or consequential." (1999 Cenestin Agreement § 13.10). Such provisions are routine and fully enforceable under Ohio law. *See, e.g., Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 638-40 (Ohio 1989). That provision is dispositive here, because nothing in the Agreement "expressly provide[s]" for $68 million in damages for an alleged breach. Rather, even if Duramed were deemed to have terminated under Section 13.4 of the Agreement (since no broad hormone alliance had been reach by the parties), it could be liable – at most – for a "residual payment" amounting to about $10 million. Indeed, a Solvay employee conducted an analysis of Solvay's recovery under the Agreement if "Barr Terminates" the amended 1999 Cenestin Agreement. That analysis showed no payments of damages or lost profits, but instead a residual payment for five years (20 quarters) – the residual payment set forth in Section 4.3 of the Agreement. (Duramed Ex. 267).

The arbitrators here did not award the remedy "expressly provided" for such a termination. The panel's award of damages was not only unauthorized, *but expressly precluded*, by the clear and unambiguous language of the very agreement providing for arbitration. By disregarding this plain language, the arbitrators manifestly "exceeded their powers," 9 U.S.C. § 10(a)(4), and the award must be vacated. *See, e.g., Missouri River Servs., Inc. v. Omaha Tribe of Nebraska*, 267 F.3d 848, 855 (8th Cir. 2001) ("The arbitrator was not free to disregard [] unambiguous language" limiting remedies or to "craft her own remedy."); *Ficks Reed, AFL-CIO*, 965 F.2d at 126; *Coast Trading Co. v. Pacific Molasses Co.*, 681 F.2d 1195, 1198 (9th Cir. 1982) (vacating award "as being contrary to remedies provided in the contract and as beyond the authority of the arbitrators under the submission"); *Swift Indus., Inc. v. Botany Indus., Inc.*, 466

F.2d 1125, 1132-34 (3d Cir. 1972) (vacating arbitration award granting remedy not authorized by agreement).

The "exclusive remedy"/"no damages" provision in the agreement between Duramed and Solvay was no quirky or inconsequential detail, but rather a standard provision at the very heart of the agreement. It is particularly difficult to measure damages or lost profits with respect to new prescription drugs, and the parties agreed to prohibit such speculative and potentially limitless remedies in favor of a carefully defined and limited remedy. Indeed, the parties here projected sales of $60 million during the first full calendar year of the Agreement, but Solvay did not deliver even one-quarter of that amount. (Hr'g Tr. at 997-98). In light of the "exclusive remedy"/"no damages" provision, however, Duramed did not sue Solvay for damages based on Solvay's failure to meet sales projections. That is the *whole point* of such a provision: to avoid massive and highly speculative damages awards with respect to a new prescription drug.

The dissent by Chairman Mercurio further highlights the inherent difficulty of proving damages in this context. As Chairman Mercurio explained, Solvay's own internal analyses and projections, even those made before the release of a national health study that depressed sales of hormone replacement therapies like Cenestin and therefore based on projections of sales that were "higher than actual sales would have been," did not project recoveries of even half the award. (Arbitration Award, Statement of Chairman Mercurio at 2). Indeed, Chairman Mercurio found that even under Solvay's sales forecasts for April 2002, Solvay "would never have recovered its cumulative advertising sales and promotional expenses." This was further confirmed by actual real-world sales of Cenestin. As Chairman Mercurio noted, actual Cenestin sales for 2003 were "21% lower than Solvay's April 2002 forecasts had projected for that year." In other words, Solvay would have lost money on the deal. The point here is not simply that the

panel majority's damages award is baseless, but that the parties here expressly precluded such awards (and specified "[t]ermination" as their "exclusive remedy") precisely because of the inherent difficulty of calculating damages in this context, and the vast potential liability for both parties if such claims were allowed.

**B.** **The Panel Exceeded Its Authority By Awarding $68 Million in Damages For Termination When The Agreement Expressly Permitted Termination.**

Apart from the panel majority's failure to follow the no-damages clause, its disregard of the express termination provisions in the amended 1999 Cenestin Co-Promotion Agreement independently requires vacatur. Under the Agreement's termination provisions, (1) Duramed was entitled to terminate if the parties had not reached a long-term hormone alliance, in which case Duramed would be responsible for making the $10-million residual payment (1999 Cenestin Agreement § 13.4); and (2) the Agreement was to terminate automatically upon termination of either of two "Related Agreements." (1999 Cenestin Agreement § 13.8).

It is undisputed that the parties never reached the long-term hormone alliance contemplated in § 13.4. (Hr'g Tr. at 4320-21). Moreover, Duramed terminated (without a challenge by Solvay) one of the "Related Agreements" (the Prometrium/Estratest Agreement), and therefore termination of the Cenestin Agreement was automatic under § 13.8. In either case, termination was lawful.

It could not be maintained that the January 27, 2000 Letter abrogated the termination provisions of the Cenestin Co-Promotion Agreement merely because it extended the term of that agreement. The parties' 1999 Cenestin Agreement itself contained both term and termination provisions and expressly provided for the extension of the "term" in writing by the parties. Far from contradicting each other, the "term" and "termination" provisions are complementary. The Agreement as amended has a maximum *term* of ten years subject to earlier *termination* by either

party. Indeed, the Agreement itself expressly states that it *"may be terminated* earlier than the expiration of the TERM OF THE AGREEMENT" as set forth in the termination provisions. (1999 Cenestin Agreement § 13.1). Consequently, the extension of the term provision did not alter the termination provisions. This reading gives effect to both provisions in accordance with well-established principles of contract interpretation.[7] Because the Agreement expressly provided for Duramed's termination, the Panel exceeded its authority by finding breach as the result of that termination.

### C. Solvay's Attempts To Avoid The Agreement's "Exclusive Remedy"/"No Damages" Provision And Termination Provisions Must Be Rejected.

Solvay seeks to avoid the express limits on the arbitrator's authority by arguing that paragraphs 2 and 3 of the January 27, 2000 Letter were actually intended to be a separate and independent contract, and that this dispute relates to that separate, two-paragraph contract rather than the amended 1999 Cenestin Agreement. That argument, however, does not pass the straight-face test.

As an initial matter, even a cursory glance at the January 2000 letter shows that it is not a collection of separate, stand-alone contracts that somehow replace the October 1999 Agreement. There is nothing in the letter that purports to cancel, replace or abrogate the earlier 1999 Cenestin Agreement. To the contrary, the letter *presupposes* the continuing vitality of the October 1999 Agreement, and extends its term (which otherwise would have expired on December 31, 2000).

---

[7] *See dB Sales, Inc. v. Digital Equip. Corp.*, 951 F. Supp. 1322, 1331-32 (N.D. Ohio 1996) (recognizing that the "term" of an agreement has no effect on the "termination" provisions), *aff'd*, 125 F.3d 855 (6th Cir. 1997); *accord Gollberg v. Bramson Publ'g Co.*, 685 F.2d 224, 227-28 (7th Cir. 1982); *Bradley v. United States*, No. 189-76, 1977 WL 9579, at *1 (Ct. Cl. Apr. 1, 1977); *Singpiel v. Morris*, 582 N.W.2d 715, 718 (S.D. 1998); *Johnson Lakes Dev., Inc. v. Central Neb. Pub. Power & Irrigation Dist.*, 576 N.W.2d 806, 815-16 (Neb. 1998); *Norman v. Recreation Ctrs. of Sun City, Inc.*, 752 P.2d 514, 517 (Ariz. Ct. App. 1988).

(Letter at SOLVAY 05735). Presumably for that reason, Solvay has tried to parse even the letter and to argue that paragraphs 2 and 3 *alone* represent a separate and independent contract. But that argument violates the most basic principles of Ohio contract law (as well as common sense), which provide that a contract must include all essential terms to be binding.[8] Here, a "contract" comprised solely of paragraphs 2 and 3 of the January 2000 letter would lack basic contractual terms required of an enforceable contract.[9] Even if such a truncated contract were somehow enforceable, it would be terminable at will. *See, e.g., Miller v. Wikel Mfg. Co.* 545 N.E.2d 76, 79 (Ohio 1989); *Oil, Chem. & Atomic Workers Int'l Union v. Martin Marietta Energy Sys., Inc.*, 646 N.E.2d 883, 886-87 (Ohio App. 1994).

The bottom line is that this dispute arises under the amended 1999 Cenestin Agreement, and is therefore governed by the provisions of that Agreement. Indeed, even the arbitration panel majority acknowledged as much, finding that the governing contract in this case is the

---

[8] *See, e.g., Rulli v. Fan Co.*, 683 N.E.2d 337, 339 (Ohio 1997); *see also Turner v. Langenbrunner*, No. 2003-10-099, 2004 WL 1197213, at *2 (Ohio App. June 1, 2004); *Riordan's Sporting Goods, Inc. v. Riordan's Sports & Equip., LLC*, No. 2002-T-0099, 2003 WL 21689860, at *2 (Ohio App. July 18, 2003).

[9] *See, e.g., Scovill v. WSYX/ABC, Sinclair Broad. Group, Inc.*, 312 F. Supp. 2d 955, 963 (S.D. Ohio 2004) (recognizing that "[a]s with any contract, an arbitration agreement must be supported by adequate consideration in order to be enforceable" and that "'a contract is illusory . . . when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise'") (quoting *Century 21 Am. Landmark, Inc. v. McIntyre*, 427 N.E.2d 534 (Ohio App. 1980)); *Imbrogno v. MIMRx.COM, Inc.*, No. 03AP-345, 2003 WL 22707792, at *2 (Ohio App. Nov. 18, 2003) ("If a promise is illusory, of course, then the contract is not enforceable."); *Oneida Sand and Gravel, Inc. v. Messer*, No. 601, 1992 WL 236872, at *2 (Ohio App. Sept. 25, 1992) ("'But where a continuing contract does not expressly provide as to its duration, the court will not construe a definite duration where it can find nothing in the contract which indicates the intention of the parties as to its duration. In such a case the contract is void for uncertainty as to time.'") (quoting 17 Ohio Jurisprudence 3d 475-476, Contracts, § 43); *Klaiss v. Klaiss*, No. 13-87-6, 1988 WL 40422, at *3 (Ohio App. May 2, 1988) (finding contract void for uncertainty as to time where "there is nothing in this agreement which indicates the intention of the parties as to its duration").

October 1999 agreement "as *amended* by the letter agreement entered into by the parties on January 27, 2000." (Arbitration Award at 1 (emphasis added)).[10]

Nothing in the January 27, 2000 Letter changed the "exclusive remedy"/"no damages" provision (or the termination provisions) of the 1999 Cenestin Agreement. Indeed, where (as here) an agreement is defined by more than one writing, Ohio law requires that those writings be harmonized so as to give effect to all provisions to the fullest extent possible.[11]

Perhaps the most obvious flaw in Solvay's argument that the January 2000 letter (in whole or in part) represents a stand-alone agreement is that the theory would render this dispute non-arbitrable, because the letter does not provide for arbitration. Solvay, in other words, cannot have it both ways: if the "exclusive remedy"/"no damages" and termination provisions of the

---

[10] While an absence of reasoning may make it more difficult to establish "manifest disregard for the law," *see, e.g., Dawahare v. Spencer*, 210 F.3d 666, 669-70 (6th Cir. 2000); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995); *Federated Dep't Stores v. J.V.B. Indus., Inc.*, 894 F.2d 862, 868 (6th Cir. 1990)), that principle does not apply here. *First*, the arbitrators did state that they were ruling the 1999 Cenestin Agreement as amended by the letter agreement dated January 27, 2000" (Arbitration Award at 1). This determination, coupled with the panel's failure to observe the clear terms of the amended 1999 Cenestin Agreement (of which it was plainly aware), demonstrates a manifest disregard of the law. *Second*, *Dawahare* did not involve a claim that the arbitrators exceeded their contractual authority by disregarding contractual limits on that authority. Because a claim that the arbitrators exceeded the authority set forth in the contract does not require an analysis of the arbitrators' reasoning, *Dawahare* is irrelevant to such a claim. In any event, the panel's actions here both exceeded the arbitrators' authority and further meet the requirements for establishing a manifest disregard of the law. The award must be vacated under either of these different bases.

[11] *See, e.g., Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997); *Starr Co. v. CBS*, 36 N.E.2d 861, 864 (Ohio App. 1941); *Condon v. H.C. Hazen Contracting Co.*, 170 N.E. 870, ¶ 2 of syllabus (Ohio 1930); *Cincinnati, Sandusky & Cleveland RR. Co. v. Indiana, Bloomington & W. Ry. Co.*, 7 N.E. 139, ¶ 2 of syllabus (Ohio 1886); *see also Ottery v. Bland*, 536 N.E.2d 651, 654 (Ohio App.1987). *See also Trinova Corp. v. Pilkington Bros., P.L.C.*, 638 N.E.2d 572, 576 (Ohio 1994) (subsequent agreement between parties does not "supersede or modify unambiguous terms in a preceding contract unless the subsequent agreement *specifically evidences an intent* to do so") (emphasis added).

October 1999 Agreement do not apply, then the arbitration provision of that same agreement does not apply either, and this dispute is not arbitrable. *See Grinnell Corp. v. Local Union 854, United Ass'n of Journeymen*, 882 F. Supp. 684, 686-87 (W.D. Tenn. 1993) (vacating arbitration award based on alleged oral contract, where basis for arbitration was clause found in distinct written contract). A litigant pursuing arbitration cannot pick and choose the substantive contractual provisions that it likes and disregard the rest. Indeed, Solvay itself recognized as much by relying on the arbitration provision *in the 1999 Cenestin Agreement* in its demand for arbitration. (*See* Arbitration Demand ¶ 3). And when Solvay took the position in the arbitration that the January 27, 2000 Letter contained multiple separate contracts, Duramed repeatedly challenged the arbitration panel's authority to adjudicate any dispute under such a stand-alone contract. Even under Solvay's bizarre contractual interpretation, then, the Court should vacate the award.

### D. The Panel Exceeded Its Authority By Purporting To Award Post-Judgment Interest Beyond What Is Permitted Under Federal Law.

Finally, separate and independent of the panel majority's failure to abide by the Agreement's unambiguous "exclusive remedy"/"no damages" provision, the panel majority further exceeded its authority by purporting to award interest at the rate of 7.5% on any amounts "not paid when due." (Arbitration Award at 1). To the extent that the panel majority thereby attempted to impose that interest rate on a judgment, if any, confirming the award, the panel majority exceeded its authority. It is well settled that, after an arbitration award is confirmed and reduced to judgment, interest may be assessed *only* at the rate set by the federal interest statute, 28 U.S.C. § 1961(a). *See, e.g., Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 268-69 (2d Cir. 1989); *Parsons & Whittemore Ala. Mach. & Serv. Corp. v. Yeargin Constr. Co.*, 744 F.2d 1482, 1484 (11th Cir. 1984) (*per curiam*); 1 Martin Domke, *The*

*Law & Practice of Commercial Arbitration* § 35:6 (2003) ("Under the FAA ... postjudgment interest is governed by federal law."). Since 2002, this statutory rate has been approximately 2%. Thus, if this Court were to confirm the award here, it would be required to apply the federal statutory post-judgment rate rather than the significantly higher rate awarded by the panel.

## CONCLUSION

For the foregoing reasons, Duramed respectfully requests that this Court deny Solvay's application to confirm the arbitration award, and grant Duramed's motion to vacate that award.

August 9, 2004

Respectfully submitted,

s / James E. Burke

_____

James E. Burke
R. Patrick DeWine
KEATING, MUETHING & KLEKAMP, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, OH 45202
Tel: 513-579-6570
Fax: 513-579-6457

Thomas D. Yannucci, P.C.
Christopher Landau
Pat A. Cipollone
Gerald F. Masoudi
KIRKLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
Tel: 202-879-5000

*Attorneys for Duramed Pharmaceuticals, Inc.*

1324421.1